## DiPompeo, Appellant, v. Preston.

Argued May 2, 1956. Before Stern, C. J., Jones, Chidsey, Musmanno and Arnold, JJ.

*William T. Adis,* for appellants.

*Augustine J. Rieffel,* for appellees.

Opinion by Mr. Justice Musmanno, June 25, 1956:
From time to time in the year 1954, and prior there-

to, Ermanno Borza, who, as a shoemaker, plied his trade at 5641 Chew Street, Philadelphia, would leave his lasts to visit a taproom only five doors away to refresh himself with a glass or two of beer. On some of these visits, as he was waited on by Mrs. Alice B. Preston, proprietor of the premises, he would say to her: "Mrs. Preston, you're too nice to be behind the bar." On the morning of August 15, 1954, Mrs. Preston returned the courtesy of Borza's business by calling at his place of business with a pair of shoes for repairing. At the shoemaker shop she and Borza again took up their apparently favorite subject for conversation, namely, the possible sale of the Preston taproom. On the afternoon of that same day, Borza reappeared at the taproom and said to Mrs. Preston: "Sell the place . . . and you will be a better woman, and go away."

Although Mrs. Preston owned the land and building which accommodated the drinking place, the liquor license for the establishment was registered in the name of her husband William Preston, Sr., and her son, William Preston, Jr. After the conversation in the taproom on the afternoon of August 15th, Borza communicated with his friend, Rocco di Pompeo, who was a steel worker, but, like the shoemaker, also entertained the desire to go into business. In full cooperation, the shoemaker and the steelworker now engaged the services of an attorney, T. G. Leomporra, and the three of them proceeded to Prestons to offer $12,000 for the real estate and $11,000 for the liquor license. Attorney Leomporra drew up two agreements, which after being read to all the persons concerned, were signed by them. The purchasers then turned over to Attorney Leomporra $500 to hold in escrow, pending transferring of the liquor license, but they did not make the $500 cash down payment stipulated in the agreement for the sale of the real estate.

Two days later the Prestons expressed an intention to repudiate the agreements and then on August 10th, through counsel, they notified Attorney Leomporra that they were rescinding the agreements because of the failure of plaintiffs to make the cash down payment on the real estate transaction. Di Pompeo immediately offered the $500 in cash but the Prestons refused to accept it, whereupon Di Pompeo and Borza instituted an action in equity to compel specific performance of the agreements. The Court of Common Pleas (No. 7) of Philadelphia County dismissed the complaint and this appeal followed.

The Chancellor in the Court below was of the belief that the neglect in proferring the $500 cash payment at the time of the signing of the agreements constituted a failure of consideration which vitiated the entire transaction since, according to the Chancellor, the two agrecments were interdependent. In this rationalization the learned Chancellor erred. The $500 was not the consideration itself, it was only, as specifically stated, a down payment. The consideration moving from the plaintiffs was the offer to pay $12,000 for the real estate, and the consideration moving from the defendants to the plaintiffs was their promise to convey the real estate. It is to be noted in this connection that, standing alone, failure to pay money on a designated day does not of itself justify rescission. In the case of *Morrell v. Broadbent*, 291 Pa. 503, 505, this Court said: "Ordinarily, failure to pay money on a particular day is not such material departure from the terms of a contract as to justify a rescission by the other party, as the delay may be fully compensated by the payment of interest; hence time is not considered as of the essence of a contract unless there is an additional factor, such as wilful refusal to pay or change in the circumstances or in the situation of the parties

resulting in injury from the delay, insufficient to be compensated by the mere allowance of interest . . ."

Nor is there evidence in the case that the defendants suffered any loss because of the plaintiffs' delay of five days in tendering the down payment.

It was contended by the defendants in the Court below that at the time the agreements were signed, the defendants were upset, harried and distraught over the ill health and nervous condition of Mrs. Preston; further, that they all lacked education and business acumen, and that the plaintiffs took advantage of these circumstances to use high-pressure methods in convincing them to sell for $11,000 a liquor license which had a much higher value. Although there was evidence that both Mr. and Mrs. Preston were receiving medical treatment and that at the time of the execution of the agreements Mrs. Preston was in a "highly nervous state" and Mr. Preston had been drinking, the Chancellor found as a fact that "there was not such undue influence on plaintiffs' part as to constitute fraud."

The Chancellor did hold, however, that there were other circumstances which demonstrated that the plaintiffs acted in a bad faith, which, together with the evidence of the defendants' physical and mental condition, justified rescission of the agreements. The Chancellor regarded one of those circumstances to be that the plaintiffs "appeared too much in a hurry to get the agreements signed." He based this finding on the fact (1) that less than six hours had elapsed between the time a price was agreed upon and the agreements were formalized and executed; (2) that the plaintiffs made no inquiry regarding possible creditors of the vendors; (3) that the plaintiffs requested no inventory of the fixtures; (4) and that the plaintiffs did not examine the books of the business.

There is something left to be desired in the Chancellor's reasoning that a rapid acceptance of an advantageous offer implies bad faith. In the competitive business world of today, where rivalry in every phase compels immediate action, delays frequently work disadvantages and often the loss of good business opportunities. If the plaintiffs chose to go ahead without inventory and examination of the defendants' business books, that was the chance they were willing to take in entering into a business transaction which seemed like a bargain to them. That they struck while the iron was hot is not evidence that they raised a hammer of bad faith. To lay down a rule of law that immediate acceptance of a business offer is evidence of improper dealing would be to introduce chaos into the whole contractual world. Business men would need to draw a check rein on their good judgment for fear that if they quickly accepted an offer they might later be branded as sharpers and their accepted transactions would be proclaimed null and void.

To strike down an agreement as tainted with bad faith on the part of him who seeks its enforcement, there must be something more than the mere fact that signatures were attached to formal documents six hours after the bargain was struck. When persons are negotiating, no matter for what purpose, there comes a moment of grave determination when minds meet in complete accord, entire harmony, and thorough understanding, and when that moment is solemnized with ink, handshake, or appropriate words or action, a covenant is formed which cannot be dissevered with legal approbation. Despite transitory illness on the part of Mrs. Preston and some indication of alcoholic imbibition on the part of Mr. Preston, they were both clearly aware of what they were doing. Moreover, they

were assisted in their negotiations by their son and by an attorney.

Apparently realizing that something more than a speedy acceptance of the defendants' offer was needed to stigmatize the Preston business transaction as an unconscionable one, the Chancellor laid stress on the evidence that the defendants offered to sell to the plaintiffs a liquor license for $11,000 when "the going market price for a liquor license in Philadelphia County was $17,000, more or less." The record, however, is devoid of testimony as to the length of time which would be required to produce a purchaser with $17,-000. Nor was there any evidence as to the extent a selling price of $17,000 would be reduced by a business broker's commission. The record also lacks proof as to the value of the building, for which the plaintiffs agreed to pay $12,000. And then, the fact that a contractual price and a market value do not coincide does not of itself invalidate an agreement.

The defendants here are seeking to take Equity into a realm where it has no right or duty to enter. While Equity stands ready to rescue the lambs from the wolves, it has no obligation to guide persons who are sui juris in the conduct of their own affairs or to save them from the results of their own imprudence, if there be imprudence. Equity cannot contract for the parties. It is only where circumstances come to light which so shock the concept of fairness and justice that it would be unconscionable to enforce the bargain that Equity intervenes. In an analysis of the facts in the case at bar one can as easily come to the conclusion that the asserted physical and mental condition of the defendants supports the finding that it was because of that condition that the defendants desired to get out of business as that it disabled them in their negotiations with the plaintiffs. In this respect, some light is shed

on the intention of the defendants by Frank Zinn, a real estate agent. He testified that Mr. Preston had told him he wanted to sell the property and that on August 5, 1954 he (Zinn) informed Preston that he had a purchaser who would pay $10,000 for the license but that Mr. Preston said that he (Zinn) was "out of luck" because he, Preston, "had got the better price" and that the lawyer "was coming up there to draw some papers."

While it is sometimes stated that specific performance is not a matter of right but one of grace, it is established law that the discretion of the Chancellor in any given case must be exercised in accordance with accepted judicial principles. Where a contract is adjudicated to be one which does not offend against conscience, fairness and equity, the right to specific performance becomes one of right, and not merely of grace. As far back as 1892 this Court said in the case of *Walters v. McElroy,* 151 Pa. 549: "The phrase 'of grace' predicated of a decree in equity had its origin in an age when kings dispensed their royal favors by the hands of their chancellors, but, although it continues to be repeated occasionally, it has no rightful place in the jurisprudence of a free commonwealth, and ought to be relegated to the age in which it was appropriate. It has been somewhere said that equity has its laws as law has its equity. This is but another form of saying that equitable remedies are administered in accordance with rules as certain as human wisdom can devise, leaving their application only in doubtful cases to the discretion, not the unmerited favor or grace of the chancellor . . ."

Decree reversed with direction that the cause be remanded for an appropriate order for specific performance.

Mr. Justice JONES dissents.