**Sportelli v. Richetta**

*Louis Minotti*, for plaintiff.

*Malos, Baurkot & Baratta*, for defendant.

FRANCIOSA, J., April 3, 1973.—Plaintiffs, Salvatore Sportelli and Patricia Sportelli, his wife, instituted this action in equity seeking specific performance of a written agreement for the sale to them of a piece of real estate in Williams Township. Defendants, also husband and wife, are the vendors under the agreement. They have answered plaintiffs' bill by alleging that the request for specific performance is barred by their (defendants') valid rescission of the contract. A hearing was held on November 30, 1972. On the basis of the pleadings, stipulations and the credible evidence, we make the following

## FINDINGS OF FACT

1. On July 26, 1972, defendant, Ralph Richetta and his wife, Nanette Richetta, were owners of real estate in Williams Township, Northampton County, Pa.

2. On July 26, 1972, defendants entered into a written agreement to convey the real estate to plaintiffs, Salvatore Sportelli and Patricia Sportelli, for a consideration of $33,000 payable $3,000 on the signing of the agreement and the balance upon delivery of the deed.

3. The agreement provided that the $3,000 deposit was to be retained by defendants as liquidating damages in case of the default of plaintiffs in the performance of the terms of the agreement.

4. The agreement further provided that the parties bound themselves to the performance of its terms within 45 days of the signing, time to be of the essence.

5. One week after the agreement was signed, plain-

tiff discovered that the fireplace he had thought to be real was artificial. Pursuant to this discovery, plaintiff stopped payment on the $3,000 check advanced to defendants as a down payment.

6. Defendants, who had given the check to their attorney, Mr. Baurkot, to hold until settlement, were unaware of the stop-payment order at this time.

7. Two days after he issued the stop-payment, plaintiff, Salvatore Sportelli, began discussing with defendant, Ralph Richetta, the possibility of abating the purchase price because of the costs involved in converting the artificial fireplace.

8. Discussions also began at this time between Mr. Baurkot and Mr. Minotti, attorney for plaintiffs, concerning an abatement in price. Various alternatives were discussed; however, the parties were unable to agree upon an abatement.

9. On August 24, 1972, Salvatore Sportelli orally advised Ralph Richetta that he did not want the property because of the additional costs involved in building an addition to the kitchen and a chimney for the fireplace. Ralph Richetta immediately informed attorney Baurkot of the conversation.

10. On the same day, acting on his attorney's advice, Ralph Richetta cashed the $3,000 check representing the down money. Five days later, on August 29, 1972, the bank at which the check was negotiated informed Ralph Richetta of plaintiffs' stop-payment. He returned the $3,000 to the bank.

11. For a period of nine days, namely, from August 29th to September 7th, defendants took no action whatsoever; they did not notify plaintiffs of their knowledge of the stop-payment; and they did not personally or through their attorney communicate a protest regarding the stop-payment incident; nor did they respond in any way to Salvatore Sportelli's

oral statement of August 24, 1972, indicating that plaintiffs no longer wanted the property.

12. In addition to their total acquiescence to plaintiffs' actions, defendants continued to meet with plaintiffs in connection with the transaction pending between them.

13. During the week following August 29th, Salvatore Sportelli had a face-to-face meeting with Ralph Richetta. In the course of the conversation, Sportelli told Richetta that he wanted to close the real estate transaction. He proposed to give defendants the bulk of the purchase price and to place a portion of it into escrow until the plaintiffs' demand for an abatement was resolved by arbitration. Defendant, Ralph Richetta, replied that he would have to talk to his lawyer.

14. As late as September 4, 1972, defendants were engaging in conversations with plaintiffs concerning the contract between them. Defendants made no statements cancelling or rescinding the agreement of July 26, 1972.

15. Three days later, on September 7, 1972, defendants sent a letter to plaintiffs notifying them that the July 26th agreement was null and void due to:

(a) plaintiffs' insistence on an abatement which amounted to a counter-offer, and which, by its terms, was a rejection of the specifications in the original contract; and

(b) plaintiffs' action of issuing a stop-payment order on the $3,000 check, representing the down money, so as to deprive defendants of the benefits of the down payment.

16. While defendants' letter of September 7, 1972, made no mention of it, they had, in fact, entered into a second agreement with a third party on that date. The new buyer had agreed to pay a higher price for the real estate.

17. Plaintiffs responded to the September 7th notice by sending a telegram to defendants informing them that settlement would take place at 10 a.m., on September 9, 1972, at attorney Minotti's office.

18. The telegram also stated that, at the time of settlement, plaintiffs would tender the full purchase price of $33,000.

19. The settlement date of September 9, 1972, was the forty-fifth day after execution of the July 26th agreement and, therefore, within the time period fixed for the performance of the contract.

20. Plaintiffs appeared for settlement with a bank check for $33,000. However, the transfer of the real estate was not consummated because defendants failed to attend the scheduled closing.

## DISCUSSION

The sole issue we must decide is whether defendants' attempted rescission of the July 26th agreement of sale was effective.[1] A reading of the conclusions of law submitted by defendants reveals that two grounds are offered in support of such a finding. Defendants earnestly contend: (1) that the stopping of payment on the check representing the down money constituted a failure of consideration which vitiated their entire transaction with plaintiffs; and (2) that other actions of Salvatore Sportelli, when considered together with the stop-payment, established plaintiffs'

---

[1] The artificial nature of the fireplace no longer has any significance independent of the rescission issue. At the conclusion of plaintiffs' case, the chancellor concluded that the evidence was insufficient to justify specific performance at less than the agreed purchase price. Accordingly, the request for an abatement was dismissed. Apparently, plaintiffs are abiding by the chancellor's ruling. At this point in the proceedings, they are demanding specific performance at the full purchase price without abatement.

abandonment of the contract in question. We will discuss the two contentions in that order.

We have found one reported case holding that a court may refuse to grant specific performance where payment is stopped on a check representing deposit money. However, that per curiam decision did not fashion any general rule applicable to all cases. See Salot v. Hechtmann, 270 Pa. 228, 113 Atl. 191 (1921).

The more recent cases hold that the fact a vendor of real estate was deprived of the benefit of a down payment, standing alone, does not of itself justify rescission.

In DiPompeo v. Preston, 385 Pa. 512, 123 A. 2d 671 (1956), it was held that the neglect in proffering the down payment at the time of the signing of the agreements did not constitute a failure of consideration which vitiated the entire transaction. The rationalization of the Supreme Court was that in a contract to sell real estate the consideration moving from the vendee is the offer to pay the stated purchase price for the real estate within the time period specified for final settlement; and the consideration moving from the vendor is the promise to convey the real estate.

Our Supreme Court went on to quote its earlier decision in Morrell v. Broadbent, 291 Pa. 503, 140 Atl. 500 (1928), where the following was stated:

"Ordinarily, failure to pay money on a particular day is not such material departure from the terms of a contract as to justify a rescission by the other party, as the delay may be fully compensated by the payment of interest; hence time is not considered as of the essence of a contract or use . . . unless there is an additional factor, such as wilful refusal to pay or change in the circumstances or in the situation of the parties resulting in injury from the delay, insufficient to be compensated by the mere allowance of interest."

In the instant case, the agreement of July 26th states that the $3,000 deposit "shall be retained by the said party of the first part (defendants) as liquidating damages in case of the default by the party of the second part (plaintiffs) in the performance of the terms of this agreement." Thus, the very contract between the parties negates the right of defendants to have use of the deposit money prior to the time of settlement. Since defendants' right to use the down money did not vest until September 9, 1972, they have not suffered any loss because of the stop-payment occurrence. Any loss of use of the purchase price after September 9, 1972, did not result from the actions of plaintiffs. Quite to the contrary, such loss of use is chargeable to defendants. They were the ones who refused plaintiffs' tender of full performance on September 9, 1972.[2]

Furthermore, defendant Ralph Richetta's own conduct does not support a finding that he intended to rescind his contract with plaintiffs because of their actions. A contract in writing for the purchase of land may be rescinded only by such conduct as clearly shows an intention to rescind: Kirk v. Brentwood Manor Homes, Inc., 191 Pa. Superior Ct. 488, 159 A. 2d 48 (1960).

An intention on the part of defendants to rescind certainly was not shown for a period of several days immediately following the stopping of payment on the down money check. From August 29th to September 7th, defendants permitted the occurrence to pass without taking affirmative action of any kind. On August 29th, Ralph Richetta returned the $3,000 to

---

[2] That the deposit money was intended to serve solely as liquidated damages with defendants having no right of use pending settlement is further demonstrated by the fact that the check covering the down money was delivered to sellers' attorney to hold in escrow until the closing date.

the bank at which the down-payment check had been negotiated without uttering a single word in protest to anyone. Thereafter, he had several face-to-face conversations with Salvatore Sportelli. On each occasion, they fully discussed their pending real estate transaction. At no time did Ralph Richetta even mention his unsuccessful attempt to negotiate the check representing the down money. Instead, as late as September 4, 1972,[3] defendants allowed Sportelli to speak about the alternative of holding a settlement subject to an escrowing of part of the purchase price until the claim for an abatement was resolved by arbitration. Ralph Richetta responded that he would take up the proposal with his attorney. But, not once did he make a statement that there was no longer a binding agreement between them. In our opinion, defendants' conduct between August 29th and Septem-

---

[3] Although this date was not specifically mentioned in the record before us, it is fixed by reason of defendant Ralph Richetta's testimony. On his redirect examination the following appears:

"Q. On September 7, 1972, you were in Mr. Baurkot's office when the letter was dictated, is that correct?

"A. I think it was earlier than that, wasn't it? I'm not sure of the dates.

"Q. You were present when the letter was dictated?

"A. Yes.

"Q. And Mr. Baurkot informed you the manner which it would be served?

"A. Yes, I signed the letter.

"Q. And Mr. Baurkot, however, informed you the manner it was going to be served, by registered mail and personal service?

"A. Well, I hand carried it, one copy.

"THE COURT: To Mr. Minotti's office?

"A. No, to Mr. Sportelli's home and gave it to his wife.

"THE COURT: How long was that before Mr. Sportelli was through your house? This is important, Mr. Richetta.

"A. This was a couple days, I imagine, three days.

"THE COURT: Two to three days you would fix it?

"A. I would say, yes."

ber 7th showed an intention to waive the stop-payment occurrence and to hold on to the agreement of July 26th rather than an intention to rescind that contract.

This brings us to the legal effect of defendants' September 7th letter. In making such a determination, we need not decide whether defendants were in a position to rescind as of that date. Assuming, arguendo, that they were, the agreement could not be cancelled in the manner adopted by defendants. Where a seller has waived strict compliance with regard to the terms of payment, he cannot rescind the agreement without affording the buyer a reasonable time for performance. See Cohn v. Weiss, 356 Pa. 78, 51 A. 2d 740 (1947); also, Knable v. Bradley, 430 Pa. 153, 242 A. 2d 224 (1968); and Page v. Albee Penna. Homes, Inc., 55 Erie 43 (1972). Clearly, defendants' letter of September 7, 1972, made no demand for performance, but abruptly notified plaintiffs that they considered the July 26th agreement "null and void."

Moreover, defendants' letter did not afford plaintiffs even the opportunity to perform within the time specified in the agreement of sale. As of September 7th, the stated settlement date had not been passed.[4] Hence, the circumstance that time is of the essence of the contract does not bar the right of plaintiffs to specific performance. Their tender of the full purchase price on September 9, 1972, must be construed as timely performance. It was tender of payment on the exact date specified in the agreement between the parties.

After an analysis of the facts in the case at bar one can easily come to the conclusion that, but for defend-

---

[4] The July 26, 1972, agreement of sale provided for settlement within 45 days; therefore, September 9, 1972, was the final date for a timely settlement.

ants' discovery of a new buyer on September 7, 1972,[5] they, and not plaintiffs, would be the parties demanding specific performance of the agreement of sale in question. As we see it, it would offend against conscience, fairness and equity to permit defendants to at first totally acquiesce in the stop-payment occurrence, and then later seize upon that event as a device to get the better price.

Defendants' other contention that plaintiffs' actions constituted an abandonment of contract is equally without merit. In support of this second ground, defendants submit the case of Mason v. Hasso, 90 Ariz. 126, 367 P. 2d 1 (1961), and other decisions annotated in 68 A.L.R. 2d 581. The cases brought to our attention by defendants hold as follows: where a vendee abandons his rights under a contract for the sale of realty, on the option of the vendor, the contractual arrangement may be terminated without the necessity of tendering a deed.

Those authorities, however, are not applicable to the case at hand. Here, defendants made no attempt to rescind prior to September 7, 1972. As we have previously noted, as late as September 4th, plaintiffs announced their interest in closing the real estate transaction. Obviously, when defendants gave written notice of termination, they had no reason to believe that plaintiffs had abandoned their rights under the July 26th agreement.

Finally, included as one of defendants' submitted conclusions of law is the claim that plaintiffs come into this proceeding with "unclean hands." The con-

---

[5] By September 7th, the parties had come down to the last two days for performance under their July 26th agreement. Significantly, defendants' first affirmative action with respect to a rescission coincided with their execution, on September 7th, of a second contract of sale with a new buyer at a higher price.

clusion is based solely upon the stop-payment incident. Since we have found that this happening did not vitiate the transaction in question, the "unclean hands" argument is dismissed without further discussion.

We, therefore, enter the following

## CONCLUSIONS OF LAW

1. The court has jurisdiction over the parties and the issues raised.

2. Plaintiffs' stopping of payment on the check representing the down money does not constitute a failure of consideration.

3. Under the agreement of July 26, 1972, the consideration moving from plaintiffs was their promise to pay $33,000 for the real estate; and the consideration moving from defendants was their promise to convey the real estate.

4. The down money payable under the agreement was intended to serve as liquidated damages in the case of a default by plaintiffs.

5. Although time was made of the essence in the contract between the parties, that provision refers solely to the time fixed for settlement.

6. Defendants were not entitled to the use of the purchase price, or any part thereof, until the time of settlement.

7. Any loss of use has not resulted from the actions of plaintiffs, but has occurred because of defendants' failure to accept plaintiffs' timely tender of the full purchase price.

8. The record does not establish that plaintiffs abandoned their contract with defendants.

9. Plaintiffs do not come into this equity proceeding with "unclean hands."

10. By granting specific performance, we are doing nothing more than enforcing the contract in question as bargained for by the parties.

## DECREE NISI

And now, April 3, 1973, it is ordered and decreed that:

A. Defendants shall execute and deliver a general warranty deed to plaintiffs for the premises covered by the July 26, 1972, agreement of sale.

B. Immediately upon delivery of said general warranty deed to plaintiffs, they shall pay to defendants the principal sum of $33,000, without interest.

C. The apportionment of county, township and school taxes to be based upon the date of the delivery of deed.

D. All other closing costs are to be governed by the terms of the agreement of sale of July 26, 1972.

The clerk of court, Civil Division, shall give prompt notice of the entry of this decree nisi. Thereafter, if exceptions are not taken within 20 days after such notice, this decree nisi shall be entered by the clerk of court as the final decree.

Compliance with the terms of this decree must take place within 20 days after it has become final.